[Cite as *In re C.T.*, 2020-Ohio-4965.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  | : | JUDGES: |
|  | : |  |
|  | : | Hon. William B. Hoffman, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| IN RE C.T. | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
|  | : | Case No. 2020 CA 00014 |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Licking County Court of
                             Common Pleas, Juvenile Division, Case
                             Nos. F2017-0448 & F2017-0449

JUDGMENT:                    AFFIRMED

DATE OF JUDGMENT ENTRY:      October 19, 2020

APPEARANCES:

For Appellant-Mother:                For Appellee-LCDJFS:

ANDREW E. RUSS                       WILLIAM C. HAYES
100 Taylor Station Rd., Suite G      LICKING COUNTY PROSECUTOR
Gahanna, OH 43230
                                     PAULA M. SAWYERS
                                     20 S. Second St., 4th Floor
                                     Newark, OH 43055

*Delaney, J.*

{¶1} Appellant-Mother appeals the January 22, 2020 judgment entry of the Licking County Court of Common Pleas, Juvenile Division granting permanent custody of minor children D.T. and C.T. to Appellee-Licking County Department of Job and Family Services.

## FACTS AND PROCEDURAL HISTORY

{¶2} Mother and Father are the biological parents of C.T. (born on November 29, 2013), and D.T. (born on June 18, 2017). Mother and Father began their relationship in 2011. The relationship ended in 2017, but they renewed their relationship in January 2019.

## Removal Due to Dependency

{¶3} LCDJFS became involved with the family when it received allegations that upon admission to the hospital for D.T.'s birth, Mother was drug screened and tested positive for methamphetamines, amphetamines, and oxycodone. D.T. exhibited signs of withdrawal at birth and tested 11 out of 12 on the Finnegan Scoring System. Mother wanted to leave the hospital with D.T. against medical advice. The infant was transferred to Nationwide Children's Hospital for treatment of neonatal abstinence syndrome and was discharged on June 23, 2017 in stable condition.

{¶4} LCDJFS started an investigation into the family. At the time of D.T.'s birth, Father was working in New York. Upon his return to Ohio, Father tested positive for THC and oxycodone. Maternal Grandmother was watching C.T. at the time of D.T.'s birth.

{¶5} On June 20, 2017, Appellee Licking County Department of Job and Family Services, Children Services Division, ("LCDJFS") filed an emergency ex parte order for

custody of C.T. and D.T. An emergency shelter care hearing was held on June 21, 2017. An uncontested adjudicatory hearing was held on August 18, 2017 where the children were determined to be dependent. The trial court found Mother and Father lacked stable housing and Mother used methamphetamine and opiates during her pregnancy with D.T.

{¶6}   Veronica Harter was assigned to the family as the Ongoing Social Worker. A case plan for Mother and Father was filed with the trial court on July 14, 2017, which was adopted on September 15, 2017. The case plan for Mother included the following objectives: complete substance abuse assessment and follow all recommendations; complete random drug screens; establish stable housing and employment to meet basic needs of children; and complete parenting education course. The case plan for Father included the following objectives: complete substance abuse assessment and follow all recommendations; complete random drug screens; establish stable housing and employment to meet basic needs of children; and complete parenting education course. The case plans for Mother and Father were amended for Mother to complete a mental health assessment and follow all recommendations and Mother and Father were to engage in relationship counseling.

{¶7}   An uncontested dispositional hearing was held on September 15, 2017 and the children were placed in the custody of LCDJFS. Maternal Grandmother reluctantly gave C.T. to the care of LCDJFS, almost necessitating the need for an Amber Alert based on kidnapping. The children were placed together in a foster to adopt home.

**Motions for Permanent Custody**

{¶8}   On April 26, 2018, LCDJFS filed a motion for permanent custody, which was set for an evidentiary hearing on October 19, 2018. Mother filed a motion for legal

custody to Maternal Grandmother on August 6, 2018. The trial court denied the motion for legal custody. On October 22, 2018, the motion for permanent custody was amended to a motion for an extension of temporary custody. Temporary custody was extended until December 20, 2018.

{¶9} LCDJFS filed a second motion for permanent custody on November 30, 2018. On March 1, 2019, the second motion for permanent custody was amended to a motion for extension of temporary custody. The motion was granted and temporary custody was extended to June 20, 2019.

{¶10} LCDJFS filed its third motion for permanent custody on May 9, 2019. The matter was set for an evidentiary hearing on August 21, 2019. On August 14, 2019, Mother filed a motion for temporary or legal custody of the children to Maternal Uncle. The following is evidence adduced at the evidentiary hearing before the magistrate.

**Housing**

{¶11} At the time of the children's removal, Mother was residing with Maternal Grandmother and Father was residing with Paternal Grandmother. Mother and Father then moved to Warsaw, Ohio and resided there for three to four months. Mother next moved to a friend's home in Columbus, Ohio and Father moved back with Paternal Grandmother. In October 2018, Mother moved to a trailer in Zanesville. Father moved in with Mother in January 2019. Harter conducted home visits at the trailer and observed there was no running water or heat and the ceiling in the living room was falling in. Mother and Father moved to a two-bedroom apartment in Millersburg, Ohio on August 20, 2019. Harter conducted a home visit at the apartment shortly after they moved in and observed there was no furniture, clothing, or food in the apartment. When initially asked, Mother

and Father did not know the address of their new apartment but were able to answer the question after a recess.

**Substance Abuse**

{¶12} The parties' substance abuse issues precipitated the removal of the children by LCDJFS. Harter referred both parents to Licking County Alcohol Prevention Program (LAPP). Mother completed her assessment in July 2017 and Father completed his assessment in January 2019. Father was not referred to any additional services after his assessment because he did not disclose his drug use. Mother started services with LAPP but she was discharged for failure to attend recommended services. Mother reengaged in services in February 2018 and completed substance abuse services in April 2019.

{¶13}  Mother and Father submitted to random drug screens as part of their case plan. Mother had the opportunity to take 13 drug screens and she submitted to eight drug screens. She stated that she was unable to attend the five drug screens due to schedule conflicts. In July 2018, Mother admitted to marijuana use. Mother testified that she had not done drugs since 2018. On July 29, 2019, LCDJFS conducted a random saliva drug swab on Mother. A saliva swab detects substances used one to two days prior. Mother tested positive for methamphetamine, amphetamine, and fentanyl. Dr. Donna Coy, a toxicologist and certifying scientist with the Forensic Fluids Laboratories, testified that a therapeutic level of fentanyl is generally less than 10 ng/ml. Mother's test result showed a level of 133.2 ng/ml, which could be potentially lethal. Harter contacted Mother to ensure her safety and recommend further substance abuse services, but Mother did not engage in further services. Father submitted to eight out of 11 random drug screens. Father

admitted to using marijuana. Father also submitted to a saliva swab on July 29, 2019, where he tested positive for marijuana and fentanyl at 28 ng/ml. Harter stated based on the results of the drug screens and the parents' admission to only using marijuana, the parents' substance abuse remained a concern for LCDJFS.

**Mental Health**

{¶14} LCDJFS initially had concerns about Mother's mental health because she reported being depressed. She completed a mental health assessment in August 2017 and was prescribed Prozac, Vistaril, and Zoloft for anxiety and sleep issues. In October 2017, Mother stopped taking her medication and attending counseling. She worked with her primary care physician for her mental health care.

{¶15} Due to the on and off relationship between Mother and Father, Harter added relationship counseling to their case plans. Mother allegedly attempted to schedule an appointment for counseling but was put on a waiting list.

**Financial Stability**

{¶16} When the children were placed in the temporary custody of LCDJFS, Mother was unemployed. From November 2017 to March 2018, Mother claimed to be employed through a temporary agency but she did not provide proof of her employment. In February 2018, Mother was employed as a home health aide. In January 2019, her hours were cut but she began working again as a home health aide in August 2019. Her employer testified at the hearing and was complimentary of Mother's work.

{¶17} Father was employed for a flooring company. To verify his employment, he provided paystubs to Harter that did not list his employer. He started a new job with a different flooring company in July 2019 and provided a paystub from the employer.

{¶18} Neither Father nor Mother had valid driver's licenses. Father's driver's license was suspended in 2016 and he was detained for an outstanding warrant from a traffic case. Father owned a cargo van that he drove for work and their appointments, but the van did not have back seats installed.

**Children**

{¶19} Parents engaged in biweekly supervised visitation with the children. In 2019, the visitation sessions moved from supervised at LCDJFS to supervised at Close to Home Visitation Center. The visitation sessions went well and C.T. appeared to be closer to parents than D.T. because D.T. was an infant when she was removed from the parents' care. Both children responded positively to parents. Visitation did not move beyond supervised visitation due to the parents' failures to participate in requested drug screens, obtain valid driver's licenses, provide proof of insurance, and proof of care seats.

{¶20} The parents participated in parent education session through Heartbeats. Mother completed 21 classes and Father completed six classes.

{¶21} At the time of the hearing, C.T. was five years old. C.T. started kindergarten in the 2019-2020 school year. He was developmentally on track and meeting milestones; however, he suffered from behavioral issues and attended counseling. Mother was unaware that C.T. was in counseling. C.T. was potty trained but urinated frequently on the floor and stuffed animals. The trial court appointed an attorney to represent C.T.'s interests, who reported that C.T. advocated for permanent custody to LCDJFS. After visitation with parents, C.T. expressed frustration because his parents told him he was coming home. He felt they were lying to him and he did not want to go home.

{¶22} D.T. was two years old at the time of the hearing. As a result of her in utero exposure to drugs, D.T. suffered from high muscle tone and engaged in physical therapy for one year. D.T. was doing well after physical therapy and was developmentally on track. Mother was unaware that D.T. required physical therapy after birth.

{¶23} The children had been with the same foster family since 2017. The children were bonded with their foster family. D.T. considered her foster parents as her mother and father. The family was interested in adopting the children if that became an option.

**Maternal Uncle's Motion for Legal Custody**

{¶24} Maternal Uncle, younger brother to Mother, filed a motion for temporary or legal custody of the children on August 21, 2019, which was heard at the permanent custody hearing. At the time of the hearing, Maternal Uncle was 19 years old. When the children were placed in the temporary custody of LCDJFS, Maternal Uncle was 17 years old and attending high school. He graduated from high school in 2019.

{¶25} Harter had asked Mother and Father for possible relative placements and Mother only mentioned Maternal Grandmother. Mother never informed Harter that Maternal Uncle was a possible relative placement. Harter began an investigation into placement after receiving Maternal Uncle's motion. When she determined Maternal Uncle's age, LCDJFS closed its investigation and did not conduct a home study because LCDJFS could not consider placement with people under the age of 21.

{¶26} After graduating high school, Maternal Uncle worked full time as a crane operator with AK Steel. He lived in a rental home with his girlfriend of four years. His girlfriend was 21 years old and worked as an EMT. At the time of the hearing, he and his

girlfriend were in the process of purchasing a two-bedroom home. They did not yet have bedroom furniture for the children.

{¶27} Maternal Uncle had a relationship with C.T. because Mother and C.T. lived with Maternal Grandmother while he was in high school. Maternal Uncle was at the hospital when D.T. was born, but he had no relationship with the child. He attended two visitations with Mother and C.T. and one visitation with Mother and D.T. His girlfriend had never visited with the children after they were placed with LCDJFS. Maternal Uncle was unaware of C.T.'s counseling or behavioral issues. He was also unaware that D.T. required physical therapy.

{¶28} Maternal Uncle and his girlfriend had limitedly explored their childcare options and suggested Maternal Grandmother was an option. Maternal Uncle did not know why the trial court had denied Maternal Grandmother's motion for legal custody. Maternal Uncle and his girlfriend were not aware of Mother and Father's current substance abuse issues.

**Guardian ad Litem**

{¶29} The GAL recommended it was in the best interests of the children if custody was granted to LCDJFS.

**Judgment Entry**

{¶30} The Magistrate's Decision was filed on October 1, 2019. The magistrate issued a 21-page decision that ultimately awarded custody of the children to LCDJFS. The magistrate first found it was not in the best interests of the children to be placed in the legal custody of Maternal Uncle. The magistrate next found the clear and convincing evidence demonstrated that the children had been in the temporary custody of LCDJFS

for twelve or more months of a consecutive twenty-two-month period. The children were removed on June 20, 2017 and were adjudicated 60 days later on August 18, 2017. They had been in the temporary custody of LCDJFS for the last 20 consecutive months.

{¶31} Further, the clear and convincing evidence demonstrated that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. Even with reasonable case planning and diligent efforts, parents had not remedied the conditions that initially caused the children's removal. The children were removed due to Mother's drug abuse while pregnant with D.T. Mother and Father engaged in substance abuse services and followed treatment recommendations but continued to use drugs during the pendency of the case ranging from marijuana to fentanyl. The magistrate further found that Mother and Father failed to establish stable housing and employment.

{¶32} Pursuant to R.C. 2151.414(D)(1), the magistrate next found it was in the best interest of the children to grant permanent custody to LCDJFS. In making the decision, the magistrate stated she considered all relevant factors, including but not limited to, the children's interactions and relationships with their family members and persons who may significantly affect the children, the basic and special needs of the children and their ability to express their wishes, the custodial history of the children, the children's need for a legally secure placement whether that type of placement can be achieved without a grant of permanent custody to LCDJFS and whether any of the factors in R.C. 2151.414(E)(7) to (11) are applicable.

**Objections**

{¶33} Mother filed objections and two supplemental objections to the Magistrate's Decision. She argued the Magistrate erred when she failed to consider Mother's completion of her case plan objectives. Mother also argued the Magistrate erred by not granting legal custody of the children to Maternal Uncle. Father also filed objections to the Magistrate's Decision, but did not supplement his objections after the transcript of the evidentiary hearing was filed with the trial court.

{¶34} On January 22, 2020, the trial court overruled Mother and Father's objections to the Magistrate's Decision. It adopted the Magistrate's Decision granting permanent custody of the children to LCDJFS.

{¶35} It is from this judgment entry Mother now appeals.

**ASSIGNMENTS OF ERROR**

{¶36} Mother raises two Assignments of Error:

{¶37} "I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY FAILING TO CONSIDER ALL FIVE BEST INTEREST FACTORS AS REQUIRED BY R.C. 2151.414(D)(1)(A) THROUGH (E).

{¶38} "II. THE JUVENILE COURT'S JUDGMENT GRANTING PERMANENT COURT COMMITMENT OF THE MINOR CHILD TO LICKING COUNTY CHILDREN'S SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**ANALYSIS**

**I. and II.**

{¶39} Mother argues in her first Assignment of Error that the trial court erred when it failed to consider all five best interest factors as required by R.C. 2151.414(D)(1)(a)

through (e). In her second Assignment of Error, Mother contends the decision to grant permanent custody to LCDJFS was against the manifest weight of the evidence. We consider both Assignments of Error together because they are interrelated.

### Standard of Review

{¶40} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA5758 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶41} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶42} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able

to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶43} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and (5) whether any of the factors in division (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶44} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶45} If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter

such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

### Best Interest Factors

{¶46} Mother first contends the Magistrate and trial court failed to consider the best interest factors when it granted custody of the children to LCDJFS. In the Magistrate's Decision, the magistrate specifically stated she considered all relevant factors, including but not limited to, the children's interactions and relationships with their family members and persons who may significantly affect the children, the basic and special needs of the children and their ability to express their wishes, the custodial history of the children, the children's need for a legally secure placement whether that type of placement can be achieved without a grant of permanent custody to LCDJFS and whether any of the factors in R.C. 2151.414(E)(7) to (11) are applicable.

{¶47} We next find the evidence in the record supports the trial court's decision that it was in the best interest of the children to be placed with LCDJFS. We consider the R.C. 2151.414(D) factors.

{¶48} There is no argument that Mother and Father had positive interactions with the children during their supervised biweekly visitations. The visitations, however, had not progressed beyond supervised visitation for at least 20 consecutive months due to parents' failure to complete drug screens, obtain driver's licenses, proof of car insurance, and proof of car seats. After visitations, C.T. was frustrated because he felt Mother and Father were lying to him about coming home. The GAL and Harter stated the children appeared bonded to their foster family and D.T. called them mother and father. C.T. had

a relationship with Maternal Uncle before he was removed from Mother's care, but Maternal Uncle had visited C.T. twice during visitation and visited D.T. once during visitation.

{¶49} The trial court appointed counsel to represent C.T.'s interests. C.T. expressed to his counsel that he wanted the trial court to grant custody to LCDJFS. D.T. was too young to express her wishes.

{¶50} Both children have special needs of which Mother, Father, and Maternal Uncle were not aware. C.T., while developmentally on track, was in counseling to address his behavioral issues. Specifically, the child frequently urinated on the floor or stuffed animals. D.T. suffered from in utero drug exposure and required specialized hospital care at birth. She required one year of physical therapy to address her high muscle tone as a result of her drug exposure.

{¶51} The magistrate noted the children had been in the custody of LCDJFS for twelve or more months of a consecutive twenty-two-month period. The children were removed on June 20, 2017 and were adjudicated 60 days later on August 18, 2017. They had been in the temporary custody of LCDJFS for the last 20 consecutive months. The children had been placed with the same foster to adopt family for the entirety of the case, who were bonded with the children and addressed the children's basic and special needs. The length of time the children had been in the temporary custody of LCDJFS impacted the children's need for a legally secure placement. Mother contends the goal of a legally secure placement for the children could be achieved by placing the children with Maternal Uncle instead of terminating her parental rights. The record supports the trial court's

determination that placement with Maternal Uncle was not in the best interest of the children.

{¶52} "A child's best interest is served by placing a child in a permanent situation that fosters growth, stability, and security." *Matter of K.M.*, 4th Dist. Highland No. 20CA4, 2020-Ohio-4476, 2020 WL 5568007, ¶ 55 citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991). Thus, courts are not required to favor relative or non-relative placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *Id.* citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64; *accord In re T.G.*, 4th Dist. Athens No. 15CA24, 2015-Ohio-5330, ¶ 24; *In re C.B.C.*, 4th Dist. Lawrence No. 15CA18, 15CA19, 2016-Ohio-916, ¶ 66.

{¶53} The Supreme Court of Ohio has held that a trial court need not find "by clear and convincing evidence that no suitable relative was available for placement." *Matter of K.M., supra* at ¶ 56 citing *Schaefer, supra*, at ¶ 64. It has been held that "a trial court need not first determine that no suitable relative placement exists before it may grant permanent custody to a children services agency." *Id.* quoting *In re J.M.*, 4th Dist. Ross Nos. 18CA3633, 18CA 3634, 18CA3635, 18CA3664, 18CA3665, 2018-Ohio-5374, ¶ 60.

{¶54} When this case began, Maternal Uncle was only 17 years old. By 19 years old, Maternal Uncle had successfully graduated high school, was in a long-term relationship, obtained full time employment, and was in the process of purchasing his first home. He expressed to the trial court that he wanted a "chance" to care for the children, which the trial court found considerate and understanding. We agree with the trial court that Maternal Uncle's achievements and care for the children are commendable

attributes, but they do not serve the best interests of the children in this case. Maternal Uncle had a relationship with C.T. while he lived in the home with Maternal Grandmother but he had seen C.T. twice during the pendency of the case. He had met D.T. once during visitation. Maternal Uncle's girlfriend did not have the opportunity to meet with the children during visitation. Maternal Uncle, due to his lack of contact with the children, was unaware of the children's special needs. He was further unaware of Mother and Father's current substance abuse concerns. He had not explored childcare options, other than his mother, who was already denied custody of the children. LCDJFS could not consider Maternal Uncle for placement because he was under 21 years old. The GAL concurred that it was not in the best interest to place the children with Maternal Uncle.

{¶55} Mother finally contends that she had completed her case plan, which should have given weight to the trial court's determination that reunification with Mother was an option. Where a parent has participated in his case plan and completed most or all of the plan requirements, a trial court may still properly determine that such parent has not substantially remedied the problems leading to agency involvement. *In re A.H.*, 5th Dist. Richland No. 18CA96, 2019-Ohio-1509, 2019 WL 1777306, ¶ 39 citing *In the Matter of A.L. and J.L.*, 5th Dist. Guernsey No. 11 CA 23, 2012-Ohio-481. The successful completion of a case plan is not dispositive on the issue of reunification. *In re A.P.*, 5th Dist. Licking No. 2020 CA 00033, 2020-Ohio-4120, 2020 WL 4814213, ¶ 36 citing *In re W.A.J.*, 8th Dist. Cuyahoga No. 99813, 2014-Ohio-604. While it may be in Mother's best interest to complete the case plan, this is only one factor for a trial court to consider what is in the best interest of the child. *In re B.P.*, 5th Dist. Licking No. 2000 CA 00031, 2020-

Ohio-3734, 2020 WL 4013125, ¶ 32 citing *In re A.H.*, 5th Dist. Richland No. 18CA96, 2019-Ohio-1509, 2019 WL 1777306, ¶ 38.

{¶56} Mother states she completed her case plan that included substance abuse treatment, which she allegedly completed in April 2019. On July 29, 2019, Mother tested positive for methamphetamine, amphetamine, and fentanyl. Her level of fentanyl was at least 13 times higher than the therapeutic level. After getting the result, Harter contacted Mother with fear for her safety. The children were removed from Mother's care due to concerns with her substance abuse. After approximately 24 months from the date the case plan was approved, Mother tested positive for drugs showing that Mother had not addressed the substance abuse concerns that necessitated the removal of her children.

{¶57} The best interest determination focuses on the child, not the parent. *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 59. After almost two years in the temporary care of LCDJFS, C.T. and D.T. deserve legally secure placement. Further, R.C. 2151.414(B)(1)(d) applies as the children have been in the temporary custody of the Agency for twelve or more months of the consecutive twenty-two month period.

{¶58} We find the evidence in this case supports the trial court's determination that the children should be placed in the permanent custody of LCDJFS. The Assignments of Error are overruled.

## CONCLUSION

{¶59} The judgment of the Licking County Court of Common Pleas, Juvenile Division, is affirmed.

By: Delaney, J.,

Hoffman, P.J. and

Gwin, J., concur.