[Cite as *In re G.C.*, 2022-Ohio-633.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MIAMI COUNTY**

IN RE: G.C. & O.R.

:
:
:    Appellate Case No. 2021-CA-26
:
:    Trial Court Case Nos. 22030175,
:    22030176
:
:    (Appeal from Common Pleas Court-
:    Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of March, 2022.

. . . . . . . . . . .

AUTUMN H. WHITE, Atty. Reg. No. 0088672, Assistant Prosecuting Attorney, Miami County Prosecutor's Office, 201 West Main Street, Troy, Ohio 45373
    Attorney for Appellee, Miami County Child Protective Services

RICHARD L. KAPLAN, Atty. Reg. No. 0029406, P.O. Box 751192, Dayton, Ohio 45475
    Attorney for Appellant, Father

. . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** J.R. (Father) appeals from a judgment of the Court of Common Pleas of Miami County, Juvenile Division, which granted permanent custody of his daughter, O.R., to Miami County Child Protective Services (CPS). Father filed a timely notice of appeal on September 13, 2021.

**{¶ 2}** The record establishes that on June 29, 2020, CPS filed a complaint alleging that O.R. and her half-sibling, G.C., were dependent children pursuant to R.C. 2151.04(C).[1] The complaint alleged that on June 26, 2020, Father was taking care of G.C. and O.R. when he was arrested and taken into custody by the Piqua Police. The police reported to CPS that Father had fired a gun several times within the home he shared with the children and their mother ("Mother"). The report further stated that after firing the gun inside the residence, Father removed the children from the home and laid down in the grass outside. Bullet holes were observed inside the residence and through the windows. The police believed that Father was under the influence of drugs and/or alcohol. He was subsequently charged with two counts of child endangerment and one count of improper use of a firearm while intoxicated. Mother was also arrested and taken into custody for a recent probation violation.

**{¶ 3}** Based upon Mother and Father's conduct, the juvenile court granted CPS an ex parte interim order of custody at a shelter care hearing on June 29, 2020. An adjudicatory hearing was held on July 23, 2020, at which the children were found to be dependent pursuant to R.C. 2151.04(C) by agreement of all parties. On August 19,

---

[1] Father is not G.C.'s biological father. Therefore, in this appeal, Father only has standing to raise issues that relate to the probate court's custody determination with respect to O.R.

2020, CPS was given temporary custody of G.C. and O.R. after a dispositional hearing.

{¶ 4} On September 4, 2020, the juvenile court approved and adopted a case plan for Father. The case plan outlined the services that would be available to Father to assist him in remedying the issues that had resulted in the removal of the children from his home so that the family could be reunited. Father's case plan objectives included the following: 1) complete a drug and alcohol assessment; 2) participate in individual therapy if deemed necessary through the completion of an assessment; 3) complete random drug screens offered by involved agencies; 4) obtain and maintain suitable housing; 5) obtain and maintain taxable employment; and 6) follow all rules of probation. Pursuant to the case plan, Father was awarded supervised visitation with O.R. at CPS for one hour a week. Father was also provided the opportunity to write letters and/or send cards to the children while they were in the temporary custody of CPS.[2]

{¶ 5} On April 8, 2021, CPS filed a motion to change its temporary custody to permanent custody, citing Mother and Father's lack of progress on their case plans and their lack of contact with the children while the children were out of the home for approximately ten months. On July 28, 2021, a hearing was held before a magistrate regarding CPS's motion for permanent custody. As relevant to Father, on August 17, 2021, the magistrate terminated Father's parental rights to O.R. and granted permanent custody of the child to CPS. Father did not file objections to the magistrate's decision. Thereafter, the juvenile court adopted the magistrate's decision in its entirety.

{¶ 6} It is from this judgment that Father now appeals.

---

[2] On January 4, 2021, Father was sentenced to a 14-month prison term in Miami C.P. No. 2020-CR-290 after pleading guilty to one count of discharging a firearm on or about a prohibited premises, in violation of R.C. 2923.162(A)(3).

{¶ 7} Because they are interrelated, Father's first, second, and fifth assignments of error will be discussed together as follows:

M.B., O.R.'S MOTHER, COMMITTED FRAUD ON [FATHER] AND ON THE JUVENILE COMMON PLEAS COURT WHEN BOTH THE COURT, THROUGH CPS, AND [FATHER] WERE RELYING ON M.B. TO TRUTHFULLY AND COMPLETELY NOTIFY [FATHER] OF ALL COMMUNICATIONS WITH CPS. SHE DID NOT AND THUS DEPRIVED [FATHER] OF HIS RIGHT TO DUE PROCESS.

THE RELIANCE ON THE FLAWED COMMUNICATION DESCRIBED ABOVE LEAD [sic] TO A VIOLATION OF [FATHER'S] DUE PROCESS RIGHTS.

[FATHER] UNEQUIVOCALLY REBUTTED THE PRESUMPTION OF ABANDONMENT. AS A CONSEQUENCE THE COURT ERRED TO THE PREJUDICE OF O.R. AND [FATHER] WHEN IT HELD [FATHER] ABANDONED HIS DAUGHTER O.R.

{¶ 8} In these assignments, Father essentially contends that because Mother committed a fraud upon the juvenile court and himself, he rebutted the presumption that he abandoned O.R. Father also argues that Mother's fraud against him deprived him of his due process rights.

{¶ 9} Initially, we note that because Father failed to file any objections to the magistrate's decision, we review his appeal under a plain error analysis. Juv.R. 40(D)(3)(b)(iv) provides that "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or

not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." "The purpose behind the appellate waiver rule is to ensure that the trial judge shall have an opportunity to correct any errors occurring in the trial judge's court, the only exception being for plain error." *In re M.G. and C.G.*, 2d Dist. Miami No. 07-CA-6, 2007-Ohio-3589, ¶ 15. Thus, the failure to file objections waives the right to appellate review and precludes relief in the absence of plain error. *In re A.P.*, 2d Dist. Montgomery No. 28023, 2019-Ohio-139, ¶ 10, citing *In re Etter*, 134 Ohio App.3d 484, 731 N.E.2d 694 (1st Dist.1998).

{¶ 10} " '[I]n appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.' " *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2, 2007-Ohio-3433, ¶ 16, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus. Consequently, because Father failed to file objections to the magistrate's decision, we review his claims only for plain error.

{¶ 11} The United States Supreme Court has described parents' interest in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). This interest, however, is not absolute. "The state has broad authority to intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Prob. Div.*, 150 Ohio

St.3d 230, 2016-Ohio-7382, 81 N.E.3d 380, ¶ 58 (O'Connor, C.J., dissenting).

{¶ 12} R.C. 2151.414 sets forth a two-part analysis for courts to consider when determining a motion for permanent custody to a public services agency. First, the trial court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with the parent within a reasonable time; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody; or (d) has been in the temporary custody of one or more public or private children services agency for 12 or more months of a consecutive 22-month period. *In re J.N.,* 2d Dist. Clark No. 2019-CA-82, 2020-Ohio-4157, ¶ 26; R.C. 2151.414. If the first prong is met, the court must then determine whether granting permanent custody is in the best interest of the child. *Id.*; R.C. 2151.414(B)(1).

{¶ 13} Here, the juvenile court found by clear and convincing evidence that O.R. could not be placed with Mother or Father within a reasonable period of time or should not be placed with either parent, pursuant to R.C. 2151.414(E)(1); "following the placement of [O.R.] outside of her home and notwithstanding reasonable case planning and diligent efforts by the [CPS] to assist [Father] and [Mother] to remedy the problems that initially caused [O.R.] to be placed outside of the home, [Father] and [Mother] have failed continuously and repeatedly to substantially remedy the conditions causing [O.R.] to be placed outside her home." Magistrate's Dec. p. 7-8.[3]

{¶ 14} With respect to abandonment, the juvenile court also found by clear and convincing evidence that:

---

[3] We note that Father does not argue in his brief that the juvenile court's finding that O.R. could not be placed with him within a reasonable period of time was *not* clearly and convincingly supported by the record.

[O.R.] * * * is an abandoned child pursuant to ORC 2151.011(C) in that her parents have failed to visit or maintain contact with her for more than ninety days. [Mother] and [Father] have not visited or maintained contact with [O.R.] since September 29, 2020. Though [Father] is currently incarcerated, his sentence did not begin until January 4, 2021. Therefore, he had gone more than 90 days without visiting or contacting [O.R.] prior to incarceration. Re-establishing contact after his release would not negate this finding of abandonment, and the statutory definition of abandonment does not require that a parent intended to abandon their child.

{¶ 15} R.C. 2151.011(C) states:

For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.

{¶ 16} The juvenile court found that Father's last visitation or contact with O.R. occurred on September 29, 2020. Although Father was incarcerated at the time the magistrate issued her decision, the juvenile court stated that it was not considering Father's period of incarceration when making its finding that he had abandoned O.R. Rather, the 90-day time period during which Father failed to visit or contact O.R. began on September 29, 2020, and continued until January 4, 2021, before he was incarcerated for 14 months in Case No. 2020-CR-290.

{¶ 17} Father argues that the reason he did not visit or have contact with O.R. for over 90 days was because Mother deprived him of his right to due process. The

"fundamental requirement of [procedural] due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). However, due process procedures are owed to an individual by a governmental entity, not another individual. Accordingly, any action or inaction by Mother could not have violated Father's rights to due process.

{¶ 18} In support of his claim that Mother committed fraud against him and the juvenile court, Father cites to *Barton v. Barton*, 2d Dist. Greene No. 2015-CA-53, 2016-Ohio-5264, which discusses the difference between fraud on the court and fraud on another party. *Barton*, however, sets forth a test by which a party may prevail on Civ.R. 60(B) motion for relief from judgment. It is undisputed that Civ.R. 60(B) permits relief from judgment for fraud, misrepresentation, and other unscrupulous conduct from an adverse party. Nevertheless, "[i]t is well established that a Civ.R. 60(B) motion cannot be used as a substitute for an appeal and that the doctrine of res judicata applies to such a motion." *Id.* at ¶ 14, quoting *Bank of Am., N.A. v. Kuchta*, 141 Ohio St.3d 75, 2014-Ohio-4275, 21 N.E.3d 1040, ¶ 16. Civ.R. 60(B) "does not exist to allow a party to obtain relief from his or her own choice to forgo an appeal from an adverse decision." (Citation omitted.) *Id.* at ¶ 15.

{¶ 19} Furthermore, other than his bare allegations, Father presented no evidence that Mother ever committed a fraud upon the juvenile court. Mother never presented any evidence regarding the whereabouts of Father and/or his willingness to visit O.R. The record establishes that any communications or miscommunications from Mother would have been made directly to the parties' CPS caseworker, Lawrence Dunleavy. Dunleavy

testified that during some conversations with Mother, she would state that that she was calling on behalf of Father as well. These communications, however, were not substitutions for contacts or attempts to make contact by Father.

{¶ 20} Dunleavy testified that he personally met with Father following a hearing in this case, gave Father a business card, discussed a case plan with him, and set up a visitation schedule for Father and O.R. The visitation schedule remained unchanged throughout the pendency of the case, as did Dunleavy's contact information. The record established that Father understood he had a duty to independently contact Dunleavy when he called to cancel visitation because he had gotten a job in Cincinnati, Ohio. Father testified that he was able to directly communicate with Dunleavy to schedule his weekly visitation with O.R. Simply put, the record establishes that Father understood that he had a duty to contact his caseworker at CPS and that Mother did nothing to interfere with Father in this regard.

{¶ 21} Father also argues that CPS violated his due process rights by suspending visitation with O.R. without giving him proper notice and an opportunity to be heard. Father testified that he did not know until January 2, 2021, that Dunleavy had suspended his visitation with O.R. Therefore, CPS's suspension of Father's visitation could not have been the reason he failed to contact or visit O.R. for over 90 days since he was unaware of the suspension until after 90 days had passed. Here, we find that the record establishes that Father's failure to visit or contact his daughter for over 90 days was attributable only to his own conduct.

{¶ 22} Thus, we conclude that Father was not deprived of any due process rights, and the juvenile court correctly found that Father had failed to adduce any credible

evidence to rebut the presumption that he abandoned O.R. when he ceased contacting or visiting her for over 90 days between September 29, 2020, and January 4, 2021. Rather, the record establishes that Father's abandonment of O.R. was not attributable to any lack of effort by Dunleavy, any fraud committed by Mother, or any alleged violation of his due process rights. Therefore, the juvenile court did not err, plainly or otherwise, when it found that Father had abandoned O.R.

{¶ 23} Father's first, second, and fifth assignments of error are overruled.

{¶ 24} Because they are interrelated, Father's third and fourth assignments of error will be discussed together:

THE TRIAL COURT ERRED WHEN IT PERMANENTLY REMOVED INFANT O.R. FROM THE CUSTODY OF HER FATHER AS THE FRAUD IN THIS CASE PREVENTED LEGITIMATE LITIGATION AND CONSEQUENTLY IT IS NOT IN THE BEST INTEREST OF THE CHILD FOR THE STATE TO TAKE PERMANENT CUSTODY.

THE DECISION OF THE MAGISTRATE TO GRANT PERMANENT CUSTODY OF O.R. TO CPS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE EVIDENCE WAS INSUFFICIENT.

{¶ 25} Father argues that CPS presented insufficient evidence that awarding custody of O.R. to CPS was in the child's best interest. Father also argues that the juvenile court's decision in this regard was against the manifest weight of the evidence.

{¶ 26} "In a proceeding for the termination of parental rights, all of the court's findings must be supported by clear and convincing evidence." *In re M.S.*, 2d Dist. Clark No. 2008-CA-70, 2009-Ohio-3123, ¶ 15, citing R.C. 2151.414(E). A reviewing court will

not overturn a court's grant of permanent custody to the State " 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' " *In re R.L.*, 2d Dist. Greene Nos. 2012-CA-32, 2012-CA-33, 2012-Ohio-6049, ¶ 17, quoting *In re A.U.*, 2d Dist. Montgomery No. 22287, 2008-Ohio-187, ¶ 9.

{¶ 27} As this Court has noted:

A children services agency that has been awarded temporary custody of a child may move for permanent custody. R.C. 2151.413(A). Before the court may award the agency permanent custody of a child, the court must conduct a hearing. R.C. 2151.414(A)(1).

A trial court may not grant a permanent custody motion unless the court determines that (1) it is in the best interest of the child to grant the agency permanent custody, and (2) one of the conditions set forth in R.C. 2151.414(B)(1)(a)-(d) exists.

*In re J.E.*, 2d Dist. Clark No. 07-CA-68, 2008-Ohio-1308, ¶ 8-9.

{¶ 28} R.C. 2151.414 provides that, in finding that "the permanent commitment is in the best interest of the child," a court must consider all relevant factors, including the statutory factors listed in division (D) of the section: "(1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child * * *; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are

applicable." *In re S.J.,* 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15.

{¶ 29} The record establishes that the juvenile court properly considered the interaction and interrelationship of O.R. with the child's parents, her half-brother, G.C., and her foster parents. Here, O.R. was removed from her parents' custody when she was only six months old. At the time of the permanent custody hearing, O.R. was over one and a half years old and had not seen or had any contact with Father since she was nine months old. Accordingly, the magistrate found that it was unlikely that O.R. would even recognize Father. The magistrate also found that O.R. and her half-brother, G.C., were living together with a foster family that had plans to adopt both children within a reasonable time. All parties also agreed that O.R. was too young and nonverbal to express her wishes regarding her custody.

{¶ 30} As previously stated, the juvenile court found that O.R. had been placed into the interim custody of CPS on June 26, 2020, and the temporary custody of CPS on September 1, 2020. CPS filed for permanent custody in April 2021, after determining that a first extension of the temporary custody order, which was due to expire on June 26 2021, would not be justified under R.C. 2151.415(D). In light of the foregoing, it is clear that O.R. required a legally secure placement and that such security could not be achieved without a grant of permanent custody to CPS. In other words, the juvenile court's finding that granting permanent custody to CPS was in O.R.'s best interest was supported by clear and convincing evidence. Thus, the juvenile court did not err, plainly or otherwise, when it granted permanent custody of O.R. to CPS.

{¶ 31} Father's third and fourth assignments of error are overruled.

{¶ 32} All of Father's assignments of error having been overruled, the judgment of

the juvenile court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and LEWIS, J., concur.

Copies sent to:

Autumn H. White
Richard L. Kaplan
Kelly M. Schroeder
Edward A. Frizzell
CASA of Miami County
Hon. Scott Altenburger